## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DEBRA SUE GRAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 12-CV-219-PJC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Debra Sue Gray ("Gray"), pursuant to 42 U.S.C. § 405(g), requests judicial

review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying her applications for disability insurance benefits and supplemental

security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance

with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States

Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of

Appeals.  Gray appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the

Commissioner erred because the ALJ incorrectly determined that Gray was not disabled.  For the

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting
Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as
Defendant in this action.  No further action need be taken to continue this suit by reason of the
last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's

decision.[2]

### Claimant's Background

Gray was 54 years old at the time of the hearing before the ALJ on April 5, 2010.  (R. 31,

36).  She was 5'1" tall, and she weighed about 160 pounds.  (R. 36).  She completed ninth grade.

(R. 36).  She obtained a certificate as a residential care aide.  (R. 37).  She last worked as a

residential care aide in 2005.  *Id.*

Gray testified that her most severe medical conditions were her back and muscle spasms

on her left side and her hands.  (R. 38).  She said that her hands went numb, swelled, and

stiffened.  *Id.*  She also experienced swelling of her neck, shoulders, and back.  *Id.*  She said that

when she experienced muscle spasms, her feet and legs curled.  (R. 38-39).  She had memory

problems, but she thought that was from the stress of her medical problems.  *Id.*  She had

problems with her breathing that caused her to be exhausted all of the time.  (R. 39).  Gray said

that she had been diagnosed with emphysema in the year before the hearing.  (R. 44).

Her back pain was in her lower back and in her middle back, including "around the mid-

section."  (R. 42).  She had a dull ache all of the time, but a sharp pain would come and go.  (R.

42-43).

Gray estimated that she could lift between five and eight pounds without it bothering her.

(R. 39).  Her treating physician had limited her to about five pounds.  *Id.*  She estimated that she

could sit for one time, depending on her condition, for about 15 or 20 minutes.  (R. 39-40).  After

---

[2] The Court notes that the Response Brief of Commissioner was filed on December 20, 2012.  Defendant's Response Brief, Dkt. #20.  A Minute Order required the brief to be filed by December 13, 2012.  Minute Order, Dkt. #15.  In the future, the Court expects the Commissioner to ensure that all briefs are filed in a timely manner.

that time, she would need to shift positions.  *Id.*  She said that she could stand for about 30

minutes at one time.  (R. 42).  She could walk about 120 feet before she needed to stop and rest.

*Id.*

      Gray said that in a typical day, she would be awakened about 4:00 or 5:00 a.m. by

spasms, difficulty breathing, and pain.  (R. 40).  She would get up, take her medications, and start

her breathing treatments.  *Id.*  She helped her adult handicapped son leave for adult day care at

8:30 a.m.  She tried to do light housekeeping from 8:30 a.m. to 11:00 a.m.  *Id.*  By 11:00 a.m.,

she would lie down and take a nap until about 3:00 p.m.  *Id.*

      Gray did light housekeeping such as light dusting.  (R. 41).  She did not mop.  *Id.*  Her

son did the vacuuming.  *Id.*  Her son did the laundry, but she would help fold.  (R. 41-42).  Gray

had a driver's license, and she drove short distances.  (R. 46).

      A neurologist did an electrodiagnostic evaluation of Gray on August 13, 2003 and stated

that the study was consistent with right carpal tunnel syndrome.  (R. 358).  His impressions were

carpal tunnel syndrome, idiopathic neuropathy, and hepatitis C.  (R. 359).

      Gray was treated at the emergency room of Claremore Regional Hospital (the "Claremore

Hospital") on January 5, 2006 following a car accident.  (R. 209-28).  She was diagnosed with a

closed head injury and cervical strain.  (R. 211).  X-rays of her cervical spine taken at the time

showed a "fairly prominent irregularity at C5/C6," which the reviewing physician believed was a

degenerative change rather than a traumatic abnormality.  (R. 226).

      Gray saw Frances Haas, D.O. at the OU Physicians Clinic (the "OU Clinic") on April 30,

2007 with a chief complaint of left-sided pain.  (R. 314-19).  She said that she had a car accident

a year earlier and had not been able to work for four or five months.  (R. 315).  She complained

of shortness of breath.  *Id.*  She said she had constant aching pain.  *Id.*  On examination, Gray's

3

lungs were clear.  (R. 317).  There was tenderness to palpation on the left side of her abdomen.  *Id.*  Gray had normal range of motion in all joints and normal gait.  *Id.*  Left arm drop test was positive.  She was tender to palpation over the left "superior trapezial ridge."  *Id.*  Her left foot was "hypersensitive" and her reflexes in her legs were more active on the left side.  *Id.*  She was prescribed medications and multiple imaging studies were ordered.  (R. 318-19).

Gray returned for follow up on June 5, 2007.  (R. 302-04).  Dr. Haas's first impression was hepatitis C, and she explained that she did not want to begin treating Gray for this until pain and depression issues could be addressed.  (R. 303).  Her second impression was neck pain, and she prescribed methadone.  *Id.*  Her third impression was depression, and Dr. Haas started a trial of lithium for Gray.  *Id.*

An MRI of Gray's cervical spine completed on June 7, 2007 showed multilevel degenerative changes throughout the cervical spine most pronounced at the C6/C7 level.  (R. 355).

Gray returned to see Dr. Haas on June 26, 2007.  (R. 294-97).  Dr. Haas's first impression was cervical radiculopathy, and she continued the prescription for methadone.  (R. 296).  Another impression was depression, and she started Gray on Paxil.  (R. 297).  Gray returned on August 30, 2007.  (R. 290-93).  One impression was polyarthralgias, and Dr. Haas refilled the methadone prescription and added amitriptyline.  (R. 292).

Gray saw Dr. Haas on October 3, 2007, and continued to have complaints of problems with sensation in her left leg and with pain in multiple locations throughout her body.  (R. 284-87).  Dr. Haas ordered multiple imaging studies.  *Id.*  Gray saw Dr. Haas for a follow-up appointment on November 6, 2007, and Dr. Haas addressed problems of sweating, polyarthralgias, and depression.  (R. 280-82).

4

Gray returned to Dr. Haas for a follow-up appointment on January 3, 2008.  (R. 268-71).  Gray said that she had constant aching and burning in her legs, with her left side worse than her right.  (R. 268).  Dr. Haas said that she would refer Gray to a neurosurgeon because she was concerned regarding permanent damage.  (R. 271).  She encouraged Gray to pursue disability benefits because she was unable to work.  *Id.*  Dr. Haas continued to wait to treat Gray's hepatitis C because she was "not in good enough health to tolerate" treatment.  *Id.*  Dr. Haas said that Gray's hypertension was controlled.  *Id.*  She wanted to refer Gray for a sleep study because she suspected sleep apnea, noting that Gray had a limited ability to breathe through her nose due to earlier injuries.  *Id.*  She said that she might refer Gray for an evaluation with an ear, nose, and throat specialist.  *Id.*  Gray returned to Dr. Haas on March 11, 2008 and on April 22, 2008.  (R. 256-59, 264-67).  Gray described cramping in her right leg and arm, and Dr. Haas said that it might be "intermittent claudication."[3]  (R. 259).  Increased methadone and adding gabapentin had helped Gray with her left leg pain.  (R. 258).  Dr. Haas wanted to change Gray's medications for her depression, but she knew that Gray could not afford Cymbalta.  *Id.*

Gray returned to Dr. Haas on July 28, 2008.  (R. 252-55).  Gray was experiencing right-sided symptoms that Dr. Haas believed were radiculopathy from her cervical spine.  (R. 254).  Dr. Haas again stated she would refer Gray to a neurosurgeon, and she prescribed a steroid medication.  *Id.*  Dr. Haas changed Gray's medication for depression to Celexa.  (R. 255).

Gray saw Dr. Haas on November 21, 2008, and on examination she was tender to palpation over the T12 and L1 area.  (R. 373).  Straight leg raising was positive on the right side,

---

[3] Intermittent claudification is "a complex of symptoms characterized by pain, tension, and weakness in a limb when walking is begun, intensification of the condition until walking becomes impossible, and disappearance of the symptoms after a period of rest."  Dorland's Illustrated Medical Dictionary 375 (29th ed. 2000).

and she had increased lumbar lordosis.[4]  *Id.*  Achilles reflexes were absent in both feet.  *Id.*  Dr. Haas's impression was thoracic/lumbosacral neuritis or radiculitis, unspecified.  (R. 374).  Dr. Haas ordered an MRI of Gray's lumbar spine.  *Id.*  Dr. Haas also changed Gray's medications to Cymbalta and amitriptyline.  *Id.*  She prescribed another course of steroids.  *Id.*

Gray returned to Dr. Haas on January 9, 2009.  (R. 366-70).  On examination, Dr. Haas noted that Gray had a dystaxic[5] gait, and Gray asked for a handicapped parking permit.  (R. 366-68).  Gray returned on February 18, 2009 and on March 23, 2009.  (R. 521-26, 534-38).  Gray was diagnosed with pedal edema, and she was advised to keep her feet elevated as much as possible, in addition to a doubling of her hypertension medication.  (R. 525).  Gray's medications for her depression were adjusted.  *Id.*  Dr. Haas again noted that she was not treating Gray's hepatitis C condition because Gray was "[t]oo ill mentally and physically."  *Id.*

Gray returned to Dr. Haas on May 26, 2009.  (R. 608-13).  Gray reported difficulty walking due to pain in her feet, and she was also experiencing severe leg pain that made it difficult to do chores such as cleaning the kitchen.  (R. 611).  Dr. Haas said that she would like for Gray to see a rheumatologist.  *Id.*  Gray had a follow-up appointment on June 23, 2009.  (R. 602-05).

Lumbar x-rays completed on June 24, 2009 showed mild to moderate lumbar spondylosis and moderate levoscoliosis of the lumbar spine.  (R. 601).

Gray returned to Dr. Haas on August 19, 2009.  (R. 587-91).  On physical examination, Gray had "[i]ncreased turgor of tissue" in her left lower abdomen.  (R. 589).  Gray was

---

[4] Lumbar lordosis is "the dorsally concave curvature of the lumbar spinal column when seen from the side."  Dorland's Illustrated Medical Dictionary 1090 (29th ed. 2000).

[5] Dystaxia is "difficulty in controlling voluntary movements."  Dorland's Illustrated Medical Dictionary 590 (29th ed. 2000).

ambulating with difficulty with a walker, and she had edema in both feet.  *Id.*  A few days earlier, Gray had fallen when getting up to answer the phone.  (R. 590).  Her left side had been numb, and she injured her left ankle in the fall.  *Id.*  Dr. Haas diagnosed a left inguinal hernia.  *Id.* Regarding Gray's pain, Dr. Haas again said that she suspected a connective tissue disease.  *Id.*

Gray was seen at the emergency room of the Claremore Hospital on September 22, 2009 with a complaint of cough and chest congestion.  (R. 620-41, 655-79).  She was diagnosed with acute bronchitis.  (R. 657).

Biopsies collected on February 1, 2010 were "suggestive of developing Barrett's esophagitis."[6]  (R. 644-53).

Gray was seen at the emergency room of the Claremore Hospital on March 25, 2010, and she was diagnosed with acute sciatica.  (R. 680-96).

Gray was seen at the emergency room of the Claremore Hospital on September 6, 2010 for shortness of breath.  (R. 697-718).  The clinical impression was acute exacerbation of chronic obstructive pulmonary disease ("COPD").  (R. 699).  She returned on November 12, 2010.  (R. 719-38).  Clinical impressions were acute bronchitis and acute exacerbation of COPD.  (R. 721).

Agency consultant Keith Patterson, D.O. completed an examination of Gray and report on February 17, 2009.[7]  (R. 491-97).  Gray's chief complaints were pain in her low back, right shoulder, leg, and foot.  (R. 491).  On examination, Gray had limited and painful range of motion

---

[6] Barrett syndrome is "peptic ulcer of the lower esophagus, often with stricture, due to the presence of columnar-lined epithelium . . . instead of the normal squamous cell epithelium." Dorland's Illustrated Medical Dictionary 1848 (29th ed. 2000).

[7] Gray was also seen for a mental status examination, and a nonexamining agency consultant found that her mental impairments were nonsevere.  (R. 486-90, 498-511).  Because it appears that Gray is not appealing from the mental portion of the consulting expert opinion evidence, the Court declines to summarize these reports in detail.

of her right shoulder.  (R. 492).  Dr. Patterson's assessments were chronic low back pain after a car accident; right shoulder injury that was apparently a rotator cuff injury; hepatitis C; "emergent" hypertension for which he instructed her to seek medical care; and psychiatric issues apparently including bipolar disorder.  (R. 492-93).

Nonexamining agency consultant Carmen Bird, M.D. completed a Physical Residual Functional Capacity Assessment dated February 25, 2009.  (R. 512-19).  For exertional limitations, Dr. Bird said that Gray could perform work at the "light" exertional level.  (R. 513).  In the portion of the form for narrative explanation, Dr. Bird reviewed Gray's claims of disability and briefly discussed Dr. Patterson's report.  *Id.*  For manipulative limitations, Dr. Bird found that Gray was limited in reaching in all directions.  (R. 515).  In narrative comments, she stated that Gray could do no overhead reaching with her right arm.  *Id.*  Dr. Bird found that no postural, visual, communicative, or environmental limitations were established.  (R. 515-19).

Agency consultant Michael Karathanos, M.D. completed an examination of Gray and report on May 26, 2009.  (R. 556-57).  Dr. Karathanos said that he had reviewed records of Dr. Haas, who suspected that Gray had a connective tissue disease.  (R. 556).  On examination, Dr. Karathanos noted Gray's problems with her right shoulder and arm, including pain and limited range of motion.  (R. 557).  Gray's gait was somewhat slow and hesitant, but appeared to be stable, and Gray could do heel and toe walking.  *Id.*  She had slightly decreased sensation to pinprick in her feet.  *Id.*  She also had slightly decreased extension and flexion of her lumbar spine.  *Id.*  Dr. Karathanos's assessments were chronic lumbosacral strain with resultant chronic pain disorder; moderate degenerative disk disease in both cervical spine and lumbosacral spine by MRI; and probable right rotator cuff syndrome.  *Id.*  Dr. Karathanos also stated that Gray "needs investigation for connective tissue disorder."  *Id.*

Nonexamining agency consultant Thurma Fiegel, M.D. completed a second Physical Residual Functional Capacity Assessment dated June 8, 2009. (R. 566-73). For exertional limitations, Dr. Fiegel said that Gray could perform work at the "light" exertional level. (R. 567). In the portion of the form for narrative explanation, Dr. Fiegel noted Gray's rotator cuff injury and the degenerative changes in her cervical and lumbar spine that were established by imaging. *Id.* She summarized the report of Dr. Karathanos, and she said that his report was consistent with the findings of Dr. Patterson and the treating medical evidence of record. *Id.* For postural limitations, Dr. Fiegel indicated that Gray could only occasionally climb, balance, stoop, kneel, crouch, or crawl. (R. 568). For manipulative limitations, Dr. Fiegel found that Gray was limited in reaching in all directions. (R. 569). In narrative comments, she stated that Gray could do no overhead reaching with her right arm. *Id.* Dr. Fiegel found that no visual, communicative, or environmental limitations were established. (R. 569-73).

Dr. Haas wrote a "To Whom It May Concern" letter dated February 2, 2009. (R. 469). She also completed a form entitled "Multiple Impairment Questionnaire" (the "Questionnaire") on that date. (R. 470-77). In her letter, Dr. Haas noted that she decided not to treat Gray for her hepatitis C condition until her pain and depression issues were addressed. (R. 469). Dr. Haas said that she had been limited in her ability to refer Gray for a neurosurgical consultation or physical therapy because of Gray's lack of income. *Id.* She said that Gray had limited her driving and had to rest when walking from the handicapped parking to her office. *Id.* Dr. Haas said that in her opinion, she did not believe that Gray could work full time in either physically active work or less strenuous work. *Id.*

In the Questionnaire, Dr. Haas said that her diagnoses were moderate multilevel cervical foraminal stenosis; mild multilevel lumbar foraminal stenosis; left rotator cuff tear; and hepatitis

9

C.  (R. 470).  She said that Gray could sit, stand, or walk for less than one hour in an eight-hour day.  (R. 472).  She said that Gray could not sit continuously and needed to change her position "all the time."  *Id.*  Dr. Haas indicated that Gray could occasionally lift and carry less than five pounds.  (R. 473).  Gray had significant limitations in doing repetitive reaching, handling, fingering, and lifting, and Dr. Haas said that Gray's fingers had numbness and tingling.  *Id.*  In Dr. Haas's opinion, Gray had a marked limitation in grasping, manipulating, and reaching with both her hands and arms.  (R. 473-74).  Dr. Haas attached a list of Gray's history of medications and imaging results.  (R. 478-85).

Dr. Haas wrote a second "To Whom It May Concern" letter dated August 4, 2009.  (R. 643).  Dr. Haas said that Gray's prognosis was poor due to multi-level cervical and lumbar foraminal stenosis and left rotator cuff tear confirmed by MRIs, x-rays, and by Gray's dystaxic gait.  *Id.*  Dr. Haas said that her opinion was that Gray was "unable to sustain any type of gainful employment," and she cited to the severity of Gray's pain.  *Id.*

## Procedural History

Gray filed applications in November 2008 for Title II disability insurance benefits and for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  (R. 115-20).  Gray alleged onset of disability as of January 1, 2006.  (R. 118).  The applications were denied initially and on reconsideration.  (R. 59-67, 72-77).  A hearing before ALJ Charles Headrick was held on April 5, 2010.  (R. 31-54).  By decision dated April 28, 2010, the ALJ found that Gray was not  disabled.  (R. 19-30).  On February 16, 2012, the Appeals Council denied review of the ALJ's findings.  (R. 1-6).  Thus, the decision of the ALJ represents a final decision for purposes of this appeal.  20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[8]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

---

[8] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Gray met insured status requirements through June 1, 2010. (R. 21). At Step One, the ALJ found that Gray had not engaged in substantial gainful activity since her alleged onset date of January 1, 2006. *Id.* At Step Two, the ALJ found that Gray had severe impairments of arthritis, hepatitis C, hypertension, hip pain, joint pain, back pain, depression, and anxiety. *Id.* At Step Three, the ALJ found that Gray's impairments did not meet any Listing. (R. 22).

The ALJ determined that Gray had the RFC to do light work, except for reaching overhead with her right arm. *Id.* At Step Four, the ALJ found that Gray could not perform any past relevant work. (R. 29). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Gray could perform, considering her age, education, work

experience, and RFC.  *Id.*  Thus, the ALJ found that Gray was not disabled from January 1, 2006 through the date of the decision.  (R. 30).

### Review

Gray asks for reversal due to the ALJ's assigning little weight to the opinion of Dr. Haas, Gray's treating physician, and due to the ALJ's credibility assessment.  The Court finds that the ALJ's consideration of the opinions given by Dr. Haas was not in keeping with legal requirements.   Because reversal is required on this issue, the Court will not address the issue of credibility.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  An ALJ must consider the opinion evidence and, if he rejects it, he must provide specific legitimate reasons for the rejection.  *Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003); *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished).

Here, the ALJ thoroughly discussed the treating medical evidence and the opinion evidence.  (R. 23-27).  In addressing the opinion evidence of Dr. Haas, he said he gave it "little weight," but it is clear that he rejected it totally because his RFC determination did not adopt any of the restrictions found by Dr. Haas.  The question, therefore, is whether the reasons he gave for this rejection were specific legitimate reasons that satisfied legal requirements.  The ALJ gave four reasons for his consideration of Dr. Haas's opinion.  (R. 28).  First, he said that the opinions rested on the subjective complaints of Gray, and he found Gray less than fully credible, so her subjective complaints were not reliable.  *Id.*  Second, he said that the course of treatment by Dr. Haas was not what would be expected for a totally disabled patient.  *Id.*  Third, he said that the

13

Questionnaire was inconsistent with Dr. Haas's treatment notes.  *Id.*  Fourth, he discounted the

Questionnaire because it was not a Social Security Administration ("SSA") form.  *Id.*

The Court abbreviates the first two reasons for rejecting Dr. Haas's opinion evidence as

the "subjective complaints" provision and the "course of treatment" provision.  Both of these are

boilerplate provisions, and the use of boilerplate language in Social Security disability cases has

been discouraged by the Tenth Circuit.  *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir.

2004).  The *Hardman* court explained that boilerplate language was a conclusion in the guise of

findings, whereas the task of the ALJ is to explain the specific facts of the case before him and

how those facts led him to his decision.  *Id.*  Boilerplate statements fail to inform the reviewing

court "in a meaningful, reviewable way of the specific evidence the ALJ considered."  *Id.*

It is easy to identify the subjective complaints and course of treatment provisions that the

ALJ used to discount Dr. Haas's opinion evidence as boilerplate provisions because they do not

give any specific information about Gray.  In the subjective complaints provision, the ALJ said

that Dr. Haas "apparently" relied on Gray's subjective assertions, and that she "seemed" to accept

Gray's reported symptoms uncritically.  The ALJ did not give any examples that might have

bolstered these vague assertions.  Moreover, the Tenth Circuit in an unpublished decision last

year labeled this provision as "conclusory" and "improper boilerplate language."  *Mayberry v.

Astrue*, 461 Fed. Appx. 705, 709 (10th Cir. 2012) (unpublished).[9]  *See also Victory*, 121 Fed.

───────────

[9] The court in *Mayberry* accepted the course of treatment provision as one of the
acceptable reasons supporting the ALJ's decision, but the court stated that the provision bordered
on improper boilerplate language.  *Mayberry*, 461 Fed. Appx. at 708-09.  The Mayb*erry* court
construed the provision as relying on inconsistencies between the opinion and the doctor's
treatment records.  *Id.*  In the present case, the undersigned finds that there is not substantial
evidence supporting the course of treatment provision, the second reason given by the ALJ to
explain his rejection of Dr. Haas's opinion evidence, explained in detail herein.

14

Appx. at 823-24 (unpublished) (ALJ's finding that treating physician had relied heavily on the claimant's subjective complaints impermissibly rested on the ALJ's own "speculative, unsupported assumption."); *but see Payton v. Astrue*, 480 Fed. Appx. 465, 467-70 (10th Cir. 2012) (unpublished) (finding rejection of treating physician opinion that included the subjective complaints provision was supported by substantial evidence and free from legal error).

Another unpublished Tenth Circuit case criticized the subjective complaints and course of treatment provisions used by the ALJ here. *Martinez v. Astrue*, 422 Fed. Appx. 719, 726 (10th Cir. 2011) (unpublished). The *Martinez* court recounted the relevant factors set forth in SSR 06-03p that the ALJ is required to consider in deciding what weight to give to treating physician opinion evidence. *Id.* The court said that the evidence cited by the ALJ in giving the provider's opinion little weight revealed that he did not have the relevant factors in mind. *Id.*

Moreover, even if the undersigned did not reject these statements as boilerplate provisions, neither of these first two reasons given for rejecting Dr. Haas's treating opinions were supported by substantial evidence. Dr. Haas attached objective medical evidence to the Questionnaire in the form of a list of Gray's medications over the longitudinal period during which Dr. Haas had treated Gray. (R. 478-80). She attached the imaging studies that supported the diagnoses of Gray's cervical and lumbar spine issues. (R. 481-84). She included the laboratory test results that showed that Gray had hepatitis C. (R. 485). In her August 2009 letter, Dr. Haas cited to Gray's "dystaxic gait" as confirming the spine issues. (R. 643). Dr. Haas's treating notes included other objective evidence supporting her evaluation of Gray's medical issues. For example, in November 2008, Gray was tender to palpation over the T12 and L1 area, and straight leg raising was positive on the right side. (R. 373). Achilles reflexes were absent in both feet. *Id.*

15

The Commissioner, in an attempt to bolster the ALJ's first subjective complaints reason for rejecting Dr. Haas's opinions, devotes significant space in her brief to examples of how Dr. Haas's opinions differ from objective evidence and the examinations of Dr. Patterson and Dr. Karathanos.  Commissioner's Brief, Dkt. #20, pp. 4-6.  The problem, of course, is that the ALJ did not state inconsistency of Dr. Haas's opinions with other evidence as a reason for rejecting it, and he gave none of the examples that the Commissioner provides.  Judicial review of an agency decision is limited to the analysis offered in the ALJ's decision, and it is improper for a reviewing court to offer a "post-hoc rationale" in order to affirm.  *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008).  The undersigned rejects the Commissioner's attempts to bolster the ALJ's first reason for rejecting the opinion evidence of Dr. Haas because it would require the court "to overstep [its] institutional role and usurp essential functions committed in the first instance to the administrative process."  *Robinson*, 366 F.3d at 1084-85 (internal quotation omitted).

The ALJ's second reason for rejection of Dr. Haas's opinion evidence, the course of treatment provision, is also not supported by substantial evidence, and, indeed, is contradicted by the vast bulk of the medical evidence.  Presumably, the ALJ's implication in the course of treatment provision is that "one would expect" more treatment, either in terms of intensity, frequency, or complexity, than Gray received.  This implication was undermined at the very beginning of Dr. Haas's treating relationship with Gray in 2007, when Dr. Haas explained that she did not want to treat Gray's hepatitis C condition until Gray's pain and depression were addressed.  (R. 303).  Thus, Dr. Haas explained at the outset that she was unable to treat Gray as aggressively as she would have liked, and Dr. Haas stated again in January 2008 and March 2009 that she was unable to treat hepatitis C because of Gray's overall health condition.  (R. 271, 525).

Additionally, Dr. Haas's treating records are replete with references to treatment she would like Gray to receive, if Gray were able to afford it.  In January 2008, Dr. Haas said that she would refer Gray to a neurosurgeon because she was concerned that Gray would experience permanent damage due to her spinal condition and the symptoms it was causing in Gray's legs. (R. 271).  At that same visit, she said that she wanted to refer Gray for a sleep study because Gray had a limited ability to breathe through her nose due to previous injuries.  *Id.*  In April 2008, Dr. Haas wanted to prescribe Cymbalta for Gray's depression, but she said that Gray could not afford it.  (R. 258).   In July 2008, Dr. Haas again said that she would refer Gray to a neurosurgeon.  (R. 254).  In the February 2009 letter accompanying the Questionnaire, Dr. Haas explained that she had been limited in her ability to refer Gray for a neurosurgical consultation or for physical therapy due to Gray's lack of income.  (R. 469).  In treatment notes in May 2009, she said that she would like for Gray to see a rheumatologist.  (R. 611).  At that time, Dr. Haas wrote a letter to Dr. Karathanos, the agency consultant who completed the second examination of Gray, explaining that Dr. Haas suspected that Gray might have a connective tissue disease, but Gray was unable to pay for extensive laboratory tests or to see a specialist.  (R. 607).  In his assessment, also in May 2009, Dr. Karathanos included a statement that Gray needed "investigation for connective tissue disorder."  (R. 557).  In August 2009, Dr. Haas repeated her concern that Gray might have a connective tissue disease.  (R. 590).  Thus, there is not substantial evidence supporting the course of treatment provision that the ALJ included as his second reason for rejecting Dr. Haas's opinion evidence.

The ALJ's third reason for rejecting Dr. Haas's opinion evidence was that the Questionnaire was inconsistent with her treatment notes.  (R. 28).  This could be a legitimate reason for rejection of a treating opinion, but the ALJ did not give any examples of how Dr.

17

Haas's opinions were inconsistent with her treatment notes. By giving a legitimate reason, but not tying that reason to evidence, the ALJ did not provide any true analysis, and this Court has nothing to review. *See Langley v. Barnhart*, 373 F.3d 1116, 1123 (10th Cir. 2004) ("Because the ALJ failed to explain or identify what the claimed inconsistencies were between [the treating physician's] opinion and the other substantial evidence in the record, his reasons for rejecting that opinion are not 'sufficiently specific' to enable this court to meaningfully review his findings.").

The Commissioner again gives a detailed discussion of how Dr. Haas's opinions were inconsistent with her own records and the other evidence. Commissioner's Brief, Dkt. #20, pp. 3-6. As was true of the Commissioner's attempt to bolster the ALJ's use of the subjective complaints provision to reject the opinions of Dr. Haas, neither these comparisons nor the Commissioner's analysis were contained in the ALJ's decision. The Court rejects the Commissioner's offer of post hoc rationales in order to affirm. *Carpenter*, 537 F.3d at 1267.

The Court rejects the ALJ's fourth stated reason for rejecting Dr. Haas's opinion evidence for similar reasons. The ALJ said that the Questionnaire was not an SSA form, and he apparently viewed it as having definitions that were inconsistent with SSA regulations. (R. 28). Perhaps this could have been a legitimate reason for rejecting the opinions presented in the Questionnaire, if the ALJ would have provided examples, explanation, or analysis. Without analysis, the Court is left with a bare conclusion. *See Jones v. Colvin*, 2013 WL 1777333 at *4-5 (10th Cir.) (unpublished) (court accepted ALJ's reason for rejecting treating physician's opinions given on form regarding manipulative limitations, but that did not support rejection of other opinions given on form); *Carpenter*, 537 F.3d at 1267 (ALJ did not explain rejection of treating physician's opinions that were given on her own form and not an agency form); *Andersen v.*

*Astrue*, 319 Fed. Appx. 712, 721-24 (10th Cir. 2009) (unpublished) (ALJ did not give sufficient reasons for rejection of opinions given by treating physicians on forms apparently designed by disability insurer).

Thus, the four reasons given by the ALJ to justify rejection of the opinion evidence of Dr. Haas are not supported by substantial evidence and are not legally sufficient.

Because the errors of the ALJ related to the opinion evidence require reversal, the undersigned does not address the remaining contentions of Gray. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Gray.

This Court takes no position on the merits of Gray's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

### Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 12th day of July 2013.

Paul J. Cleary
United States Magistrate Judge